**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**ANITA R.,**

                              **Plaintiff,**                    1:18-cv-745
                                                                      **(GLS)**

              **v.**

**ANDREW SAUL,**
**Commissioner of Social**
**Security Administration,**[1]

                              **Defendant.**

_____

**APPEARANCES:**                              **OF COUNSEL:**

**FOR THE PLAINTIFF:**
Legal Aid Society                              ALLISON ZALOBA, ESQ.
of Northeast New York
95 Central Avenue
Albany, NY 12206

**FOR THE DEFENDANT:**
HON. GRANT C. JACQUITH                    ARIELLA R. ZOLTAN
United States Attorney                          Special Assistant U.S. Attorney
100 South Clinton Street
Syracuse, NY 13261

Ellen E. Sovern
Regional Chief Counsel
Office of General Counsel, Region II
26 Federal Plaza, Room 3904
New York, NY 10278

_____

        [1] The Clerk is directed to substitute Andrew Saul, Commissioner of
Social Security, for defendant Nancy A. Berryhill, and amend the caption
accordingly. _See_ Fed. R. Civ. P. 25(d).

**Gary L. Sharpe**
**Senior District Judge**

## MEMORANDUM-DECISION AND ORDER

### I.  Introduction

Plaintiff Anita R. challenges the Commissioner of Social Security's

denial of Social Security Disability Insurance (DIB) and Supplemental

Security Income (SSI), seeking judicial review under 42 U.S.C. §§ 405(g)

and 1383(c)(3).  (Compl., Dkt. No. 1.)  After reviewing the administrative

record and carefully considering Anita's arguments, the Commissioner's

decision is reversed and remanded.

### II.  Background

Anita applied for DIB and SSI benefits in 2014.  (Tr.[2] at 134-35, 248-

60.)  When her applications were denied, (*id.* at 136-39), she requested a

hearing before an Administrative Law Judge (ALJ), (*id.* at 142-43), which

was held on June 14, 2016, (*id.* at 44-72), and continued on April 27, 2017,

(*id.* at 73-99).  On May 8, 2017, the ALJ issued a decision denying Anita's

claims for DIB and SSI benefits, (*id.* at 22-42), which became the

---

[2] Page references preceded by "Tr." are to the administrative transcript.  (Dkt. No. 9.)

2

Commissioner's final determination upon the Social Security Administration Appeals Council's denial of review, (*id.* at 1-8).

Anita commenced the present action on June 26, 2018 by filing her complaint, wherein she seeks review of the Commissioner's determination. (*See generally* Compl.)  Thereafter, the Commissioner filed a certified copy of the administrative transcript.  (Dkt. No. 9.)  Each party filed a brief seeking judgment on the pleadings.  (Dkt. Nos. 14, 17.)  On April 15, 2019, with permission from the court, Anita filed a reply brief.  (Dkt. Nos. 19, 20.)

## III.  Contentions

Anita contends that the ALJ erred (1) "in finding that [her] illiteracy and inability to communicate in English did not render her disabled under the Medical-Vocational Rules" (hereinafter "Grid Rules"); (2) in his credibility determinations; and (3) in his residual functional capacity (RFC) determinations.  (Dkt. No. 14 at 1.)  The Commissioner counters that the "decision is supported by substantial evidence in the record, and is based upon the application of the correct legal standards."  (Dkt. No. 17 at 1.)

## IV.  Facts

The court adopts the parties' factual recitations to the extent they are consistent with the statement of facts contained in the ALJ's decision and

supported by the medical record.  (Tr. at 22-36; Dkt. No. 14 at 1-16; Dkt. No. 17 at 1.)

## V.  Standard of Review

The standard for reviewing the Commissioner's final decision under 42 U.S.C. § 405(g)[3] is well established and will not be repeated here.  For a full discussion of the standard and the five-step process by which the Commissioner evaluates whether a claimant is disabled under the Act, the court refers the parties to its previous decision in *Christiana v. Comm'r of Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-*3 (N.D.N.Y. Mar. 19, 2008).

## VI.  Discussion

### A.  ALJ's RFC Finding

#### 1.  *Weight of Medical Opinion Evidence*

First, the ALJ properly gave "considerable weight" to the testimony of medical expert Dr. Louis Fuchs.  (Tr. at 32.)  Dr. Fuchs, an orthopedic surgeon, reviewed the record and opined that Anita could lift and carry up to ten pounds frequently and up to twenty pounds occasionally; sit for up to

---

[3] The § 405(g) standard of review in DIB proceedings brought under Title II of the Act also applies to SSI proceedings under Title XVI of the Act.  *See* 42 U.S.C. § 1383(c)(3).  Similarly, the analysis of SSI claims under Title XVI parallels, in relevant part, the statutory and regulatory framework applicable to DIB claims under Title II.  *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003).

eight hours in an eight-hour work day; and stand and walk for up to two hours in an eight hour workday.  (*Id.* at 1061-62, 1071.)  He also opined that Anita could use both of her hands for continuous reaching, handling, fingering, feeling, pushing, and pulling, but could only frequently reach overhead with her right hand.  (*Id.* at 1063.)  These opinions were consistent with other evidence in the record.  (*Id.* at 698, 703, 707); *see Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) ("[T]he regulations . . . permit the opinions of non[-]examining sources to override treating sources' opinions provided they are supported by evidence in the record.").  Moreover, Dr. Fuchs' opinion related to an area that he specialized in.  *See* 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5) ("We generally give more weight to the medical opinion of a specialist about the medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist.").

Next, Anita argues that the ALJ should have assigned Dr. Pablo Lopez's opinion controlling weight.  (Dkt. No. 14 at 22.)  There is no disputing that Dr. Lopez was Anita's primary care physician and treated her numerous times over the course of three years.  (Tr. at 382, 726, 729, 737, 739, 746, 994, 999, 1009, 1038, 1042, 1049, 1058.)  Although he

apparently felt that he could not complete a functional capacity questionnaire on behalf of Anita, he opined in a letter to counsel that she would need one to two fifteen to twenty minute rest periods in an eight hour work day; could stand and walk for thirty to forty-five minutes during an eight hour workday; and needed to elevate her legs. (*Id.* at 975.) However, as the ALJ noted, Dr. Lopez's own treatment notes indicated that Anita's leg swelling "improved significantly" with diuretics and treatment in May 2015 and remained stable in July 2015. (*Id.* at 34, 529, 535.) And, although Anita had experienced symptoms of leg swelling since 2005, (*id.* at 547-60), she was still able to work at jobs from 2004 to 2010 that required extended periods of walking and standing, (*id.* at 34, 54, 79, 83-84, 86, 345). Moreover, as the ALJ noted, there was no evidence that Anita's swelling condition had significantly worsened since her initial diagnosis. (*Id.* at 498-99, 523, 547-60.) Accordingly, the ALJ did not err in declining to give Dr. Lopez's opinion controlling weight. *See Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("When other substantial evidence in the record conflicts with the treating physician's opinion, however, that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given.").

## 2. Credibility Determination

After considering Anita's claims of pain and functional limitation, the ALJ found that some of Anita's statements concerning the intensity, persistence, and limiting effects of her symptoms were not supported by the record.  (Tr. at 31-34.)  For instance, as noted by the ALJ, several treatment providers observed that Anita could walk with a normal gait, (*id.* at 382, 462, 693), and her swelling was controlled with diuretics and treatment, (*id.* at 529, 535).  MRI scans also showed only mild degenerative disc disease.  (*Id.* at 540.)  Nonetheless, Anita faults the ALJ's finding that her claims of disabling pain and functional limitations were inconsistent with her reported daily activities.  (Dkt. No. 14 at 23; Tr. at 31.)

The court disagrees.  For example, there was evidence that Anita could drive.  (Tr. at 473.)  And despite Anita's testimony that she was unable to perform any household chores or ambulate outside the house, she previously reported that she was able to walk the dog, cook, bake, go grocery shopping, and do craft projects.  (*Compare id.* at 59, 69, *with* 298, 301.)  Likewise, Anita reported to Dr. Kautilya Puri and Dr. Brett Hartman that she was able to do her own cooking, cleaning, laundry, and shopping

as long as she took things slowly and took breaks.  (*Id.* at 461, 468.)  She

could also occasionally attend church.  (*Id.* at 469.)  At the hearing, Anita

also testified that she could still dress herself sometimes and take care of

her own personal hygiene.  (*Id.* at 58.)  Accordingly, the ALJ did not err in

making his credibility determination related to Anita's ability to perform light

work, which was supported by substantial evidence.  *See Poupore v.*

*Astrue*, 566 F.3d 303, 307 (2d Cir. 2009) (holding that substantial evidence

supported ALJ's finding that claimant's subjective complaints of pain were

inconsistent with medical records and activities of daily living).

    3.    *Effects of Headaches in RFC Determination*

Next, Anita argues that the ALJ erred in making his RFC

determination by failing to consider the functional limitations and

restrictions imposed by Anita's headaches.  (Dkt. No. 14 at 24-25.)  To be

sure, the ALJ noted that Anita experienced long-lasting headaches that

caused blurry vision, and found that Anita's headaches were a severe

impairment.  (Tr. at 26, 31.)  However, he then noted that Anita's

complaints were not supported by the medical evidence because her

neurologist, Dr. Konstantin Timofeev, reported that the headaches

improved with a change to her medication.  (*Id.* at 32, 498, 505.)  At her

consultative examination in October 2014, Anita reported to Dr. Puri that her headaches were decreasing with medication. (*Id.* at 461.) In February 2015, after Anita's prescription was increased, she again reported "significant improvement" with her headaches. (*Id.* at 493.) And, at her next appointment in June 2015, she denied any headaches. (*Id.* at 489.) In February 2016, Anita reported a mild to moderate headache only after running out of her medication. (*Id.* at 691.) Otherwise, Dr. Timofeev noted that Anita had "very good results" in controlling her headaches with the new prescription regimen. (*Id.*) As such, the ALJ did not err. *Cf. Fisk v. Colvin*, 14-CV-931, 2017 WL 1159730, at *4 (W.D.N.Y. Mar. 29, 2017) (holding that the ALJ's finding that the claimant's condition improved with treatment did not amount to reversible error).

**B.** **Ability to Communicate in English**

Anita argues that the ALJ erred in his assessment of Anita's literacy and ability to communicate in English. (Dkt. No. 14 at 18.) In response, the Commissioner argues that "the ALJ's findings [regarding Anita's education and ability to communicate in English] are supported by substantial evidence" and, even if they were not, "the ALJ did not rely on [Grid] Rules 202.21 and 202.14 to conclude that [Anita] was not disabled";

instead, he relied on the vocational expert's testimony that "a hypothetical individual with [Anita]'s RFC, age, and a high school education . . . would be able to perform work as a parking lot attendant, ticket taker, and coatroom attendant," and could do so even if she had a limited education instead of a high school education.  (Dkt. No. 17 at 16-17, 19-20.)  After carefully considering the record, the court finds that, even if the ALJ did not rely on Grid Rules 202.21 and 202.14, the vocational expert's opinion does not constitute substantial evidence[4] upon which the ALJ could rely on to find that Anita can perform work that exists in significant numbers in the national economy.

"Reliance on the correct grid rule is essential if the ALJ—and the vocational expert—are to evaluate [a claimant's] application properly." *Lugo v. Chater*, No. 94 CIV. 4633, 1996 WL 116233, at *4 (S.D.N.Y. Mar. 15, 1996).  Prior to placing a claimant into a particular grid rule, the ALJ

_____

[4] "Substantial evidence is defined as more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept to support a conclusion."  *Guerriere v. Comm'r of Soc. Sec.*, No. 1:13-CV-1174, 2015 WL 729734, at *2 (N.D.N.Y. Feb. 19, 2015) (internal quotation marks and citations omitted).  "Stated another way, [i]f evidence is susceptible to more than one *rational* interpretation, the Commissioner's conclusion must be upheld."  *Id.* (internal quotation marks and citations omitted) (emphasis added).

must first determine if the claimant is able to communicate in English. *See Vega v. Harris*, 636 F.2d 900, 903-904 (2d Cir. 1981); 20 C.F.R. §§ 404.1564(b)(5), 416.964(b)(5). "This finding is pivotal because it dictates which grid rule the ALJ will use as a framework for decisionmaking, and which type of testimony he will solicit from a vocational expert, if one is required." *Lugo*, 1996 WL 116233, at *3; *see* 20 C.F.R. §§ 404.1564(b)(5), 416.964(b)(5) ("Because English is the dominant language of the country, it may be difficult for someone who doesn't speak and understand English to do a job, regardless of the amount of education the person may have in another language.").

In this regard, "a vocational expert's testimony is only useful if it addresses whether the particular claimant, with his [or her] limitations and capabilities, can realistically perform a particular job." *Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1984); *see Torres v. Comm'r of Soc. Sec.*, No. 14–CV–6438, 2015 WL 5444888, at *11 (W.D.N.Y. Sept. 15, 2015) (explaining that a vocational expert's testimony based upon the ALJ's incorrect conclusion of claimant's literacy does not constitute substantial evidence); *Castillo v. Colvin*, No. 13 Civ. 5089, 2015 WL 153412, *28 (S.D.N.Y. Jan. 12, 2015) (finding vocational expert's testimony

did not support step five assessment where the ALJ failed to properly evaluate claimant's education level); *Smith v. Colvin*, No. 1:13–cv–1717, 2015 WL 65544, *4 (E.D. Cal. Jan. 5, 2015) ("[B]ecause the ALJ failed to question the vocational expert regarding whether an individual who is illiterate would also be able to perform the jobs identified, the testimony of the vocational expert has no evidentiary value for the ALJ's conclusion that [p]laintiff is able to perform [other work].").

Here, in determining that Anita "has the [RFC] to perform light work," the ALJ found that she could "interact frequently with the public, supervisors[,] and co-workers." (Tr. at 29-30.) In making this determination, the ALJ discredited Anita's testimony that she was unable to speak or read English based on her work history of "act[ing] as a translator between 2004 and 2006 in Florida," as well as her "employment as a sales clerk in supermarkets and in retail establishments," and as "a teacher's aide," which the ALJ concluded "would require at least modest proficiency in English." (*Id.* at 31-32.) The ALJ concluded that Anita had "at least a high school education and is able to communicate in English." (*Id.* at 34.)

Based on these findings, the ALJ then noted that application of Grid

Rules 202.21 and 202.14[5] would support a finding that Anita was not disabled.  (*Id.* at 35.)  However, because he also found that Anita's ability to perform light work "has been impeded by additional limitations," he also relied on the opinion of a vocational expert.  (*Id.* at 35.)  Based upon the testimony of the vocational expert, the ALJ concluded that Anita was capable of performing work that existed in significant numbers in the national economy.  (*Id.* at 34-35.)

However, the ALJ's conclusion was not supported by substantial evidence.  First, Anita's work history——the crux of the evidence cited by the ALJ——does not provide more than a mere scintilla of evidence to support a finding that Anita could communicate in English.  To the contrary, nothing about the nature of Anita's previous employment suggests that she was required to read or speak in English.  Her work as a teacher's assistant, primarily involved supervising young children: helping kids go to the bathroom, laying them down to sleep, and monitoring them at lunch and

_____

[5] Both of these Grid Rules require that the claimant be "[s]killed or semiskilled–skills not transferable" and have an education level of "[h]igh school graduate or more."  20 C.F.R. 404, Subpt. P, App'x 2, Table No. 2. The only difference is that Grid Rule 202.14 applies to a claimant "[c]losely approaching advanced age," where as Grid Rule 202.21 applies to a "[y]ounger individual."  *Id.*

after school.  (*Id.* at 54, 79, 83-84.)  There was no testimony derived or other evidence of record regarding the level of English communication required in such roles.  In fact, the ALJ recognized that Anita could not translate effectively when he attempted to clear up the vocational expert's confusion by explaining that a "translator role" for Anita "certainly wouldn't be a job category that you would list."  (*Id.* at 89.)  Prior to that, Anita worked at a daycare babysitting Spanish-speaking kids from Colombia. (*Id.* at 55, 345.)  Additionally, Anita previously worked in the back of department stores putting anti-theft devices on clothes as well as boxing and hanging them, but never did sales.  (*Id.* at 55, 80-82, 87-88, 278.)  In sum, there is not substantial evidence that Anita was required to communicate in English at any of her previous jobs.  *See Vega*, 636 F.2d at 904 (explaining that a claimant's ability to communicate enough to perform her hotel job does not necessarily mean that she was literate or able to communicate in English).

Anita testified exclusively through a Spanish interpreter at both hearings.  (Tr. at 46, 75.)  The ALJ also sent written correspondence to her in Spanish.  (*Id.* at 350-53.)  This was consistent with a prior psychiatric evaluation completed by Dr. Hartman, which noted that Anita "spoke

14

exclusively Spanish" and "required translation services."  (*Id.* at 466.)

At the hearing, Anita testified that she attended a "special school" in Puerto Rico, but never finished.  (*Id.* at 50, 78.)  However, Dr. Hartman's evaluation noted that, although Anita reported that she "receiv[ed] remedial help in all subject areas," she "completed a high school diploma."  (*Id.* at 466.).  Despite this conflicting evidence, there is nothing in the record—even assuming that she graduated from high school—to suggest that Anita spoke, read, or otherwise learned English in school.  *Cf. Lugo*, 1996 WL 116233 at *3 (finding a claimant neither "literate nor even minimally conversant in English" where, among other things, "[the claimant] testified [that] his formal education was acquired entirely in Spanish in Puerto Rico"); *Zayas v. Heckler*, 577 F. Supp. 121, 127 (S.D.N.Y. 1983) (rejecting the notion that a claimant's literacy was demonstrated by evidence that the claimant completed high school in Puerto Rico).

Next, much was made about the fact that Anita's disability report states that she can speak and understand English.  (Tr. at 286.)  At the hearing, Anita testified that she could not understand the questions in her disability report and had a Spanish girl at the Social Security Office help her fill it out.  (*Id.* at 61-63.)  She clarified that "I can read [English] a little

bit, but not a lot.  My daughter helps me a lot.  I can write it, but I don't write it really well." (*Id.* at 53.)  When asked to further clarify whether she could speak English, she testified "[s]ome things I can." (*Id.*)  Anita further testified that she indicated that she can speak and understand English on the disability report because "I can speak it.  I just don't speak it well." (*Id.* at 53.)  She later elaborated, "[i]f you talk to me, I understand some words, some things, but no[t] all of it . . . [a]nd you have to speak slow." (*Id.* at 54.)  For example, she testified, "when [my daughter] cannot go to the doctors with me, I can talk to the doctor a little bit, but they don't come out really well because I can't speak it well." (*Id.* at 53.)  This testimony is not inconsistent with a clinical summary completed by Dr. Franklin Longo on October 23, 2014 and an assessment completed by a registered nurse at the Ellis hospital emergency department on May 31, 2016, which both indicated that Anita's "preferred" language was English. (*Id.* at 473, 1102.)  Notably, the clinical summary did not indicate whether Anita was accompanied by friends or family during these visits. (*Id.* at 473.)  Although the assessment specifically noted that Anita was not accompanied by another person and the source of the information provided was herself, the extent of the information derived from Anita's ability to

communicate in English is unclear.  (*Id.* at 1102.)  Additionally, these records, which were not explored at the hearings, are in contrast to the majority of medical records suggesting that Anita spoke in Spanish or was accompanied by friends or family during medical visits.  (*See, e.g.*, *id.* at 130, 132, 297, 468, 851, 868, 894, 1133.)  As such, these isolated records, (*id.* at 473, 1102), also do not provide substantial evidence to support the ALJ's conclusion.  *See Torres*, 2015 WL 5444888, at *6 (finding "records from one emergency room visit describ[ing] [the claimant] as 'fluent' in English" and "another record indicat[ing] that [the claimant] provided her medical history without an interpreter" insufficient to support conclusion that the claimant could communicate in English).

Additionally, Anita testified that she could not read and understand English because "when I read it, I can't understand it.  I don't understand a lot of words."  (Tr. at 53.)  The disability report stated that Anita could not write more than her name in English, (*id.* at 286), but she testified that she could "write other things too besides [her] name," (*id.* at 54).  For instance, she testified that she could recognize the names of some of her medications because her daughter circles them.  (*Id.* at 63.)  The ALJ also noted evidence that Anita socialized at church and on Facebook; however,

17

no evidence was adduced regarding what language she used when socializing.  (*Id.* at 302.)  As such, similar to Anita's testimony about being able to speak some English words, none of this serves as substantial evidence to support a finding that Anita was able to communicate in English.[6]  *See Torres*, 2015 WL 5444888, at \*5 ("[T]estimony that a claimant is able to speak or understand 'some' English is generally insufficient to support a finding that the claimant is able to communicate in English."); *Delacruz v. Astrue*, No. 10 Civ. 5749, 2011 WL 6425109 at \*24-25 (S.D.N.Y. Dec. 11, 2011) (finding that the ALJ's determination that claimant could communicate in English was not supported by ability to respond to some questions without the assistance of an interpreter); *Cabrera v. Astrue*, No. 06 Civ. 9918, 2007 WL 2706276, \*6 (S.D.N.Y. Sept. 18, 2007) (finding a claimant's testimony that she sometimes read the newspaper and watched television in English, but could not always understand the words, insufficient to support conclusion that she could communicate in English), *modified on other grounds*, 2008 WL 144697

_____

[6] Ironically, despite the ALJ's demonstrated ability to communicate a few sentences to Anita in Spanish at the hearing, he concluded that "of course I can't understand what she's saying."  (Tr. at 52.)  The same logic would seem to apply to Anita's inability to communicate with others in English despite knowing some English words.

(S.D.N.Y. 2008); *Lugo*, 1996 WL 116233 at \*4-\*5 (finding a claimant's testimony that he spoke "a little" English insufficient). As such, the ALJ erred to the extent that he relied on Grid Rules 202.14 or 202.21 in finding that Anita was not disabled.

Furthermore, the ALJ's conclusion that Anita could communicate in English also colored the vocational expert's testimony such that it cannot serve as substantial evidence in support of the ALJ's finding that Anita is not disabled. That is, the ALJ relied upon the vocational expert's testimony regarding a hypothetical individual with a twelfth grade education who could frequently interact with the public, supervisors, and coworkers; however, the ALJ did not incorporate any limitations on that hypothetical individual's ability to communicate in English. (Tr. at 90-91.) Thus, the vocational expert's testimony—that although the hypothetical individual could not perform Anita's past work, there were jobs in the national economy that this person could perform—is not useful because it relies on the faulty premise that Anita had "at least a high school education and is able to communicate in English." (*Id.* at 34.)

Additionally, the vocational expert's testimony that his opinion would not change if the hypothetical individual had a limited education, because

the jobs he listed did not require a highschool education, also does not provide substantial support for the ALJ's finding. (*Id.* at 92.) The ALJ's modification to his hypothetical question did not change his initial determination that Anita could communicate in English. For the same reason that substantial evidence does not support the ALJ's finding that Anita could communicate in English, it does not support the conclusion that Anita met the criteria for a limited education under the regulations. *See Torres*, 2015 WL 5444888, at *6-*7. Indeed, the ALJ never explored this issue or made such a finding.

In any event, on cross-examination, the vocational expert testified that the jobs he listed "require interaction with the public." (Tr. at 97.) Given the evidence outlined above, there is not substantial evidence to support the finding that Anita could "interact frequently with the public, supervisors[,] and co-workers." (*Id.* at 30.) Further still, the vocational expert testified that the hypothetical individual could not perform the job listings if they "had less than a level one of language development in the [Dictionary of Occupational Titles (DOT)]." (*Id.* at 95-96.) Appendix C of the DOT defines a level one of language development to include the following abilities: "[r]ecognize meaning of 2,500 (two- or three-syllable)

words," "[r]ead at rate of 95-120 words per minute," "[c]ompare similarities and differences between words and between series of numbers," "[p]rint simple sentences containing subject, verb, and object, and series of numbers, names, and addresses," and "[s]peak simple sentences, using normal word order, and present and past tenses." *See* Dictionary of Occupational Titles, App'x C, Component of the Definition Trailer, 1991 WL 688702 (4th ed. 1991). For the above reasons, there is not substantial evidence to support a finding that Anita could meet this criteria and, again, the ALJ never made such a finding.

## VII.  Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that the decision of the Commissioner is **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum-Decision and Order; and it is further

**ORDERED** that the Clerk close this case and provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

September 27, 2019
Albany, New York

Gary L. Sharpe
U.S. District Judge